**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Continental Casualty Company, | ) | C/A No.: 3:09-cv-1004-JFA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| James R. Jones, II; Carolina Jones, aka | ) | |
| Carol Jones; Elizabeth Leitner; Jones, | ) | |
| Leitner & Co.; Jones and Leitner, CPAS,) | | |
| P.A.; Jones Leitner, Inc.; Jones, Reeves | ) | |
| & Co.; Eric Youngblood, Trustee of the | ) | **ORDER** |
| D.C. Sheppard Trust; Dana C. Sheppard, ) | | |
| Individually and as natural guardian for | ) | |
| S.S., a minor; Joe Henry, Inc.; Joe Henry) | | |
| Company 401(K) Plan; Joseph E. | ) | |
| Chambers; Henry C. Moore; David S. | ) | |
| Johnson; Catherine Johnson; Christopher ) | | |
| M. Luper Trust; Christopher M. Luper; | ) | |
| Peggy Luper, individually and as trustee | ) | |
| Of the Christopher M. Luper Trust; and | ) | |
| W. Shell Suber, Jr., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on the parties' cross-motions for summary judgment. This matter involves an insurance coverage dispute arising from the terms of two professional liability policies issued by the Plaintiff Continental Casualty Company to cover a law firm and accounting firm. This matter was previously stayed by the court, pending a decision by the United States Court of Appeals for the Fourth Circuit involving an analogous matter. *See Bryan Brothers, Inc. v. Continental Casualty Co.*, No. 10-1439, 2011 U.S. App. LEXIS 6131 (4th Cir. March 24, 2011). Now that the Fourth Circuit has

issued its opinion in that matter, the court finds the decision controlling and grants Plaintiff Continental Casualty Company's motion for summary judgment.

## **BACKGROUND**

As relevant to this matter, Defendant James Jones wore three professional hats. First, he operated a solo law practice ("Law Firm") in Cayce, South Carolina. In addition to his law practice, he was a partner with Defendant Elizabeth Leitner in an accounting practice ("Accounting Firm"). Lastly, he created and operated the Bogey Exchange Company, which served as a qualified intermediary business for Section 1031 like-kind property exchange transactions. All three of these businesses operated out of the same building. Jones created one operating account to be used by the Jones Law Firm and the Jones Accounting Firms, and funds from both practices were commingled in the account. Jones created a separate account for the Bogey Exchange Company, and all of his clients' funds from the Section 1031 transactions were commingled in that account. It is undisputed that in March of 2006, Jones began misappropriating significant amounts of money from his clients' trust accounts. For example, between March of 2006 and January 3, 2007, he misappropriated over one million dollars from his client Defendant Dana Sheppard. Jones admitted to engaging in similar misconduct with other clients' funds during the same time period, including Defendants David and Catherine Johnson and Shell Suber, and when this misconduct was discovered, several lawsuits were filed against Jones, the Accounting Firm, and the Bogey Exchange Company, among other defendants.

Plaintiff Continental Casualty Company issued professional liability policies to both the Law Firm and the Accounting Firm. With respect to the Law Firm's professional liability policy, it provided that Continental will pay the Law Firm:

> all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable . . . .

(Aiello Decl., Ex. C., Section I.A (bold in original).)

> The Lawyers Policy does not apply:
>
> to any **claim** based on or arising out of any dishonest, fraudulent, criminal or malicious act or omission by an **Insured** except that this exclusion shall not apply to **personal injury**. The **Company** shall provide the **Insured** with a defense of such **claim** unless or until the dishonest, fraudulent, criminal or malicious act or omission has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of the **Company's** rights under this Policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against the **Insured**[.]

(*Id.*, Section IV.A (bold in original).) Jones submitted a renewal application for coverage on July 26, 2007. The application consisted of multiple questions that inquired about Jones's knowledge of circumstances that could give rise to a claim. For example, question three on the application asked:

> During the current/existing policy period, are there any claims, acts or omissions that may reasonably be expected to be the basis of a claim against the firm that (a) have not been reported to the Company OR (b) were reported to the Company?

(Lawyers Application, Aiello Decl., Ex. A.) Likewise, question four of the renewal application asked:

> Is the firm, or any attorney affiliated with the firm, aware of any acts, omissions or circumstance which a reasonable person would expect may give rise to a professional liability claim in the future against the firm, any predecessor firm, or any current or former attorney of the firm while affiliated with the firm?
>
>        . . . .
>
> **Any such act, omission or circumstance must be disclosed regardless of whether it is considered likely that claim will in fact be made.**

*Id.* (bold in original). Jones answered "no" to both questions. The Lawyers Application also included a Warranty Statement, in which Jones warranted that his responses on the Lawyers Application were true and that he was not aware of any acts or omissions which a reasonable person would view as likely to give rise to a claim. (Aiello Decl., ¶ 8 & Ex. A, Application Warranty Statement.)

In addition to the application, Jones signed and submitted to Continental a "Quotation for Lawyers Professional Liability Insurance," on August 20, 2007, which was incorporated into and made part of the application. In the quotation, Jones warranted that the responses he provided on the application were unchanged, and since completion of the Lawyers Application, that he had not become "aware of any claim or circumstances which might be expected to be the basis of a claim[,]" which was not previously disclosed to Continental." (Aiello Decl., Ex. B.) Based on his responses, Continental Casualty Company issued the Law Firm a Lawyers professional liability policy for the policy period of September 2, 2007 to September 2, 2008. Jones has since

4

admitted that he knew his answers to questions three and four were incorrect and that his accompanying warranties were false.

In addition to his law practice, Jones operated an accounting firm with Leitner, as already discussed. Continental also issued an Accountants Professional Liability Policy to Jones, Leitner & Co., the accounting firm, for the policy period of January 12, 2007 to January 12, 2008. Subject to all of its terms and conditions, the Accountants Policy provides that Continental will pay on behalf of the insureds:

> all sums in excess of the deductible, up to our limits of liability, that **you** become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against **you** and reported in writing to us during the **policy period** by reason of an act or omission in the performance of **professional services** by **you** or by any person for whom **you** are legally liable provided that:
>
> 1.  **you** did not give notice to a **prior insurer** of any such act or omission or **interrelated act or omission**;
> 2.  prior to the effective date of this Policy, none of **you** had a basis to believe that any such act or omission, or **interrelated act or omission**, might reasonably be expected to be the basis of a **claim**;
> 3.  such act or omission happened subsequent to the **prior acts date**;
> 4.  **you** did not give notice to a **prior insurer** of an **interrelated claim**.

(Sterna Decl., Ex. A., Accountants Policy, § II.A.) The Accountants Policy also contained an "Innocent insureds" provision, which stated:

> If coverage under this Policy would be excluded as a result of any criminal, dishonest, illegal, fraudulent or malicious acts of any of you, we agree that the insurance coverage that would otherwise be afforded under this Policy will continue to apply to any of you who did not personally commit, have knowledge of, or participate in such criminal dishonest, illegal, fraudulent or malicious acts or in the concealment thereof from us.

(Leitner Mot. for Sum. J. Ex. E, §VI (L). Leitner, as opposed to Jones, took responsibility for the renewal of the Accountants Policy each year. Despite the fact that they shared a professional liability policy and operated as a single entity, Leitner and Jones worked independently in the accounting practice, as each had their own clientele. Moreover, Leitner never operated in conjunction with or did any work for Jones's law firm or for its clients. The same held true for Leitner's knowledge of the Bogey Exchange Company; she knew nothing about that business and never did any work for it.

In November of 2007, Leitner planned to take a vacation Thanksgiving week. Prior to leaving for vacation, on November 17, 2007, Leitner prepared the renewal application for the Accountants Policy for the January 2008 to January 2009 policy period. In doing so, she issued a check for the renewal premium and answered, "No" to the question, "Has your firm become aware of any incident that might give rise to a claim?" (Leitner Mot. for S.J. Ex. E., ¶ 12.) Leitner also signed the renewal application, declaring that "the above statements and particulars are true to the best of My/Our knowledge." She submitted the renewal application, and it appears that Leitner never consulted with Jones when completing the renewal application, nor did she know anything about Jones's misappropriation of his client's money. On Monday of the week Leitner was leaving for her vacation, she stopped by the office and discovered that Jones was not there. He had been missing for days, but was eventually located by his brother-in-law and checked into a treatment facility for alcohol addiction.[1] During this time,

---

[1] This disappearance by Jones was the culmination of a series of efforts to hide or avoid his misconduct. It appears that in late 2006, Jones's clients began to contact him frequently about the state of their accounts, and in an effort to "get them off of his back," he told his secretary that he had inoperable cancer, which was not true. Then, in the

Leitner began to learn of Jones's misconduct, and on November 27, 2007, the South Carolina Supreme Court suspended Jones from the practice of law. Leitner disassociated Jones from the accounting practice.

Within days of learning about Jones's misconduct, Leitner contacted Melanie Smith, her BB&T insurance agent to notify her that there were claims that would be asserted against the accounting firm based on Jones's misappropriations and that there were likely other victims whom Leitner had yet to discover. In light of the potential claims, Leitner asked Smith what to do about the insurance coverage and whether she should purchase a tail policy immediately or wait. Smith contacted AON, Continental Casualty's underwriter, via e-mail:

> Subject:    Jones Leitner #0915752000
>
> Lindsey,
>
> I need your help with an Underwriting question. The above client renewed the policy effective 1/12/07. There have been numerous claims that are being filed against Mr. Jones. Mr. Jones and Mrs. Leitner have split. Mrs. Leitner is purchasing her own VP policy which is before the renewal date. Mrs. Leitner would like to make sure that coverage is in place because of the claims that are being filed and will be filed in the future against Mr. Jones. Since the policy has been renewed, can the client wait until the end of the term (1/12/09) to purchase the tail?
>
> Please advise.

(Leitner Mot. for S.J. Ex. F.) In response, AON's agent stated, "Underwriting indicated it is OK for the firm to wait until Jan 2009 to purchase tail." (*Id.*) As indicated in these e-mail messages, Leitner was advised that the accounting firm could renew for the policy

---

summer of 2007, Jones realized that his wrongful conduct was about to be exposed, and in an effort to prepare for the repercussions, he attempted to protect his assets. He lied to his wife that they had been the victims of identity theft and instructed her to put all of their joint bank accounts solely in her name.

period of 2008–2009, as she already had, and purchase a tail policy at the expiration of that policy. Leitner followed this advice, and she also purchased a professional liability policy from Plaintiff to cover her new accounting practice, Elizabeth I. Leitner, CPA, P.A.

As expected, clients of Jones's law and accounting practices began making claims against both the law firm and the accounting firm. Leitner reported these claims to Continental Casualty and conducted an investigation into the accounting firm to see if there could be other clients who could allege negligence claims against the firm. Leitner also received telephone calls from several of Jones's accounting clients, who were dissatisfied with the way Jones had handled their accounts. She established a list of clients with potential claims against the accounting firm and sent this information to Continental Casualty Company. Despite not having any direct knowledge of Jones's accounting work, Leitner continued to work with Continental Casualty as they attempted to sort out the debacle created by Jones. Lawsuits were filed against the Accounting Firm in December of 2007, in September of 2008, and in April of 2009. In January of 2009, at the expiration of the 2008–2009 Accountants Policy, Leitner decided to purchase a five-year extended claim coverage policy, or "tail" policy. Approximately four months later, Continental Casualty commenced this declaratory judgment action in an effort to deny coverage for claims made against the Accounting Firm. Whether or not Continental Casualty has a duty to defend and indemnify both the Law Firm and the Accounting Firm is the issue before the court. As already noted, all of the parties involved in this suit, except for Jones and his Law Firm, have moved for summary judgment.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). When evaluating a motion under Rule 56, the Court must construe all "facts and inferences to be drawn from the facts . . . in the light most favorable to the non-moving party," *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (internal quotations omitted), and summary judgment should be granted in those cases where it is perfectly clear that there remains no genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees of Maryland Community College*, 955 F.2d 924, 928 (4th Cir. 1992). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## ANALYSIS

### I. Lawyers Policy

Plaintiff Continental Casualty Company first moves the court for judgment as a matter of law with respect to its claim to rescind the professional liability policy it issued to Jones in his capacity as a solo practitioner with his Law Firm and a determination that

it is no longer obligated to defend or indemnify Jones for any past, present, or future claim made against him based on his conduct from his duties at the Law Firm. Neither Jones nor any of the other Defendants have opposed this motion.

In order to rescind an insurance policy on the ground of fraudulent misrepresentation, Continental Casualty must show by clear and convincing evidence: "(1) the statement was false; (2) the falsity was known to the applicant; (3) the statement was material to the risk; (4) the statement was made with the intent to defraud the insurer; and (5) the insurer relied on the statement when issuing the policy." *Primerica Life Ins. Co. v. Ingram*, 365 S.C. 264, 269, 616 S.E.2d 737, 739 (S.C. Ct. App. 2005) (citation omitted). If the misstatement was a breach of warranty, the insurer need merely prove it untrue. *Nix v. Sovereign Camp, W.O.W.*, 180 S.C. 153, 187 S.E. 175, 176 (1936). No distinction between representation and warranty is required in this case, however, because there is no dispute over any material fact, whose showing is necessary to satisfy all five of the elements just listed. Jones has admitted that he stole money from the clients of his law firm; that he knew his misconduct would give rise to a claim against him and his law firm; that he admitted that he lied on his application for professional liability insurance; and that he did so with the intent to defraud the insurer because he knew by disclosing his criminal conduct, Continental Casualty would not likely agree to provide him with future coverage. After considering these facts, along with the fact that this motion goes unopposed, the court grants Continental Casualty's motion for summary judgment with respect to its action to rescind the Lawyer's Policy. It does not have an

obligation to provide defense or indemnity coverage to Jones for any past, present, or future claims arising from his law practice.

## II.    Accountants Policy

The gravamen of this suit is the question of whether or not coverage exists under the Accountants Policies issued to the Accounting Firm for claims made by Jones's clients against the Firm. Continental Casualty contends that it does not have a duty to defend or indemnify Jones, Leitner, or the Accounting Firm for any claims made against them arising out of Jones's misconduct because a condition precedent to coverage was that no insured had knowledge, prior to the inception of the policy, of an act that was reasonably likely to become the basis for a claim against the Accounting Firm. The Accountants Policy provided coverage for claims made against the firm, so long as:

> prior to the effective date of this Policy, none of you had a basis to believe that any such act or omission, or interrelated act or omission, might reasonably be expected to be the basis of a claim[.]

(Sterna Decl., Ex. A, Accountants Policy § II.A.2.) Because Jones was an insured under the policy and had knowledge of his own intentional misconduct prior to the inception of the 2007–2008 and 2008–2009 Accountants Policies, Continental Casualty contends that coverage is precluded under those Policies because a condition precedent was not satisfied.

To support its position, Continental Casualty relies on the Fourth Circuit's recent decision in *Bryan Bros., Inc. v. Cont'l Cas. Co.*, No. 10-1439, 2011 U.S. App. LEXIS 6131 (4th Cir. March 24, 2011), which decided an identical issue involving an identical professional liability policy issued by Continental Casualty to an accounting firm. In that

case, Bryan Brothers, Inc. discovered that an account clerk of the firm had stolen clients' funds from 2002 through some time after July 1, 2008.  In response to this discovery, Bryan Brothers filed for insurance coverage of the victims' claims pursuant to the professional liability policy issued by Continental Casualty, with an effective date of July 1, 2008. The Fourth Circuit, applying Virginia law, found that the prior knowledge provision of the policy, which is identical to the provision quoted above, constituted a condition precedent to coverage under the policy, and that an insurer's coverage obligation is not triggered if an insured fails to fulfill a condition of an insurance policy. Because the account clerk for Bryan Brothers constituted an insured under the policy and because she had knowledge prior to the inception of the July 1, 2008 policy that her criminal acts might be the basis of a claim, the Fourth Circuit determined that coverage under the professional liability policy was precluded.[2] In doing so, it rejected the argument, which is now asserted by Leitner, that the "Innocent insureds" provision saves coverage for the members of the accounting practice that did not participate in the misconduct that otherwise precludes coverage under the policy.

The court is mindful of the Defendants' strong disagreement with the Fourth Circuit's decision in *Bryan Brothers Inc.*, but this case aligns on all fours with that decision, such that the court is constrained to follow its ruling. Even though the Fourth Circuit applied Virginia law in *Bryan Brothers, Inc.*, the court believes the same result is

---

[2] With respect to the account clerk's thefts of clients' money that occurred during the effective policy period, the district court determined that this misconduct was "interrelated" to her pre-policy thefts and, thus, precluded from coverage because of the account clerk's prior knowledge. *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 704 F. Supp. 2d 537, 542–43 (E.D. Va. 2010). This ruling was not appealed to the Fourth Circuit. *Bryan Bros. Inc. v. Cont'l Cas. Co.*, No. 10-1439, 2011 U.S. App. LEXIS 6131, *6 (4th Cir. Mar. 24, 2011).

achieved after applying South Carolina law. Thus, the court finds that the claims asserted by the various victims against the Accounting Firm are "interrelated" for the same reason espoused by the district court in the *Bryan Brothers, Inc.* case, *See Bryan Bros. Inc. v. Cont'l Cas. Corp.*, 704 F. Supp. 2d 537, 542–43 (E.D. Va. 2010), and that the "Innocent insureds" provision does not require Continental Casualty to provide coverage under any of the policies it issued the Accounting Firm because Jones had knowledge prior to their inception that his misconduct might give rise to a claim, yet he failed to disclose that material fact to Continental Casualty before it decided to insure the Accounting Firm.

The court also denies the Defendants' contention that Continental Casualty is estopped from denying coverage under the 2008–2009 renewal policy or the tail policy. The first claim made occurred in December of 2007, during the 2007–2008 Accountants Policy. The remaining claims made by the Defendants were after this date and during subsequent policies, but as Continental Casualty argues, and this court has already found, these subsequent claims made by the victims against Jones, Leitner, and the Accounting Firm are all "interrelated," as that term is broadly defined in the Accountants Policy,[3] because they all arose out of Jones's scheme to defraud his clients of money and to cover his tracks. As the prior knowledge provision of the policy states, coverage exists unless "prior to the effective date of this Policy, none of you had a basis to believe that any such act or omission, or interrelated act or omission, might reasonably be expected to be the

---

[3] The Accountants Policy defines "Interrelated claims," as "all claims arising out of a single act or omission or arising out of interrelated acts or omissions in the rendering of professional services." (Sterna Decl., Ex. A., Accountants Policy, § I.) The Policy defines "Interrelated acts or omissions," as "all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." (*Id.*)

basis of a claim." (Sterna Decl., Ex. A., Accountants Policy, § II.A.) Because Jones's acts were interrelated, his prior knowledge precludes coverage in this case, which defeats the Defendants' estoppel argument. Moreover, as Continental Casualty points out, the 2008–2009 policy and the tail policy remain in full effect and provide meaningful coverage for the insureds. As examples, Continental Casualty informs the court that it has been dealing with potential claims pursuant to these policies for claims made during those policies' periods that have arisen out the alleged acts of Leitner and Jones, which are totally unrelated to Jones's misconduct. Accordingly, the court grants Continental Casualty's motion for summary judgment and denies Defendants' motion for summary judgment.

     IT IS SO ORDERED.

September 2, 2011                                    Joseph F. Anderson, Jr.
Columbia, South Carolina                    United States District Judge